Your Honor, my name is Keith Knowlton, and I'm representing the plaintiffs, and the appellants in this case, Ron and Megan Dible. This is a First Amendment case. It's one of great importance, and I appreciate the Court's time in listening, no matter what way the Court rules on this matter. I want to get right to the point because I need to reserve maybe five to seven minutes for rebuttal. In this particular case, we're dealing with sexual expression, in which the case law is unanimous, and we put it in our briefs that that is protected expression. As long as it does not involve obscenity or involves children. This is not the case. This is clearly pornography on the Internet. It is protected expression to any citizen. But we're dealing with a public employee. And based on the Supreme Court opinion in Roe, two tests were created out of that muddy morass called public concern test. And the Supreme Court said, well, if we have a public employee is not giving up their rights just because they're a public employee. Fifties, yes. Today, no. The case law has changed. So the Supreme Court looked at the National Treasure case and said, well, in those situations where we have speech or expression not related to employment, that takes place off-duty, not involving the employer, that does not relate to employment, we're going to do a justification. There has to be a reasonable justification, which is not speculative, for prohibiting the speech. The Supreme Court doesn't say it can't be prohibited. It just says there has to be a justification that is not speculative. What is before you today is what is that justification? And are there constitutional limits to that justification when you're dealing with entertainment expression that has no relationship whatsoever to do with the police department? To what? Has no relation to what? That has nothing to do whatsoever with the police department. Okay. So there are two branches, I guess. There's the branch of related. If this is related, then he's gone, right? He loses. Is that correct? Your Honor, based on the Roe opinion, I agree with you. Based on the Muddy Waters before then, I don't. Based on Roe. I mean, Roe is, hey, I think they're supreme. I agree with you. If it's related, he's a dead duck because there's no public concern that he can fit. Correct, Your Honor. Okay. The other part of the logic tree is unrelated. Okay?  Unrelated. Unrelated. The Court hasn't made it too clear from my standpoint whether the public concern test plays out there, too. In our opinion in Roe, we said it did. The Supreme Court didn't really say that was wrong. But it's not clear from Rehn. So it's also not clear whether it considers related to mean anything that might otherwise affect. But let's say, so unrelated, if he has to meet the public concern test unrelated, he's a dead duck, too. He's gone. Well, I If he has to meet the public concern test. Your Honor, I disagree because I think they're two different public concern tests. If you're talking about a public concern test that is dealing with not related, you look at Berger, Pataglio, every case that came down, they said, wait a minute. If it is in any way affecting or interesting to society, it meets this broad public concern test. The Supreme Court in Roe brought that public concern test in and said when we're dealing with speech related to employment, it better provide some information. It better be of benefit. There has to be some benefit to this conversation. Well, Berger did an interesting thing and said, well, even in unrelated cases, you have the public concern requirement. But then they said everything concerns the public except personal employment complaints about your boss, basically. Which is a kind of a, I mean, that's a really broad definition of public concern if you're going to have the requirement at all. Your Honor, my personal preference being, just to have this intellectually correct in my mind, is to argue that there is no public concern test on the national treasure, the first test. Because it makes no sense. And I think the trial court found that, and I'm not asking the court to reverse that, and they haven't appealed that. And I think the trial court and I argued at that time that it didn't. And so the court then went into the justification phase. But in the Sixth Circuit, there's an opinion out there that says, well, geez, that's a little different. They found that you have to have public concern in both. Roberts. If there's no public concern test, then what we have to ask is, does this have an effect on the efficiency, et cetera, of the police department? So we say, what is the effect on the police department of what this guy is doing? So then we have to ask that question. You're taking me right where I was going. But let me just. Roberts. I thought you were probably going there. So that's the next question. So we have. Before I can get to that. Is First Amendment right for what it's worth? And we've got the effect it has on his employer and employment. And that's where I think the trial court erred. There's clearly adverse impact on the mission and purpose of the employer. The employer, if there is that adverse impact. However, the case law, National Treasure and Roe and Berger and Flanagan all talk about that that has to be from the speech itself. This became public knowledge because of the press. Nobody knows how this hit the press. And when this hit the press and all this was coming out, the embarrassment. There's only two grounds that were presented of adverse impact in this case. One was embarrassment to about 80 officers out of 800 because they were asked questions about it. That's the adverse impact. That didn't come from the speech. That didn't come from the website. There's nothing in this website that adversely in any way impacts the mission and purpose of the police department. Not like there was in Roe. There clearly was in Roe. But not here. There's none of that. This was kept private, confidential. You had to pay to see the site. There was nothing about the police department in there. My client who was the police officer's face was never in there. So there's nothing to tie it in. And Judge Tilburg found that. There was nothing to tie in this website with the police department. And Judge Tilburg found that. In Roe, there was plenty. You have a male officer stripping and doing his thing. And the Supreme Court said, wait a minute. That was related to his employment in law enforcement. And that adversely affects of itself the speech, the web pages, what he was selling, impacted the mission and purpose of the police department. There was no press in Roe that was discussed. Ours is different. So what we're talking about is the Berger, Flanagan casings of the heckler's veto. And the Supreme Court, I mean, Judge Tilburg says that Roe reverses the heckler's veto. That is bedrock of our society. And I think Flanagan and Berger are the law. And I think they're accurate. And I think they're clear that if you're talking about impacts, adverse impacts, we're talking about what goes on in the police department. Chief Harris's testimony is critical on this issue. Chief Harris said there was no impact on the police department. None. He was terminated because of his involvement. And he was very clear about this. His involvement in the website alone was sufficient for terminating him. All right? So that was Chief Harris. Was this website, to make sure I understand this, was he making money off of this website? Yes, Your Honor. So he's running a little business on the side. Yes, Your Honor. Selling dirty pictures. Yes, Your Honor. And because the pictures themselves, I suppose, are protected by the First Amendment. Correct, Your Honor. So if you look at Berger, his employment is also protected by the First Amendment. Is that kind of the way this goes? No. This is a First Amendment retaliation case. And you have to deal with the Roe opinion to find out, one, if this is protected speech. If it's protected speech under the Roe analysis and national treasure, then you go down the chain. Was there adverse employment action as a result of it based on Harris's testimony? Clearly there was. And then you have to get into the Mount Healthy analysis, which I'm going to get to in just a second, dealing with, well, were there other reasons? What did we determine? Well, just let me understand the facts. What happened to him as a result of operating this little business on the side? Your Honor, some officers in the department began looking at the website. He got a call from a friend, I mean, an e-mail saying, is this you? They responded, yes, it was. That person was in dispatch. And if you're familiar with what happens when information hits the dispatch and police departments, it spreads through the department. Then he calls up internal affairs, because he's admitted to this woman from dispatch that it was him. That was his wife, and he was involved. And he calls internal affairs to say, hey, is this going to be a problem? He's told no. The next thing, he's at work, and the press show up. The day the press show up, that's the day that he's put on leave, he's sent home, and they begin their investigation, and ultimately he is terminated. Now, in all candor, yes, Your Honor? So he's terminated for what? He is terminated for conduct unbecoming an officer. There was also an argument that he lied in the investigation, which is in the briefs, which we think is a pretext completely. So, okay. So why is it – I'm still not understanding. Why is your argument not that because the speech was protected, that he couldn't be discharged as a result of the business on the side? That is my argument, Your Honor. Yeah. Oh, I thought you were saying it's a retaliation case, so we don't really make – okay. Yeah. As protected, they couldn't terminate him. They had to have – my argument is, is that alone, there's no justification for action. They had to have adverse impacts in the internal operations. They had only – they had no adverse impacts internally. Nobody – officer wouldn't work with him, anything like that. You only had this after he's already suspended as the press and officers are being asked about embarrassment. That was not part of his initial termination by Chief Harris. That came up in the appeal of that to the Merit Board. Okay. Do you want to elaborate a little bit on your comment that it's a red herring that he's giving false statements during the investigation? Your Honors, we set forth in the brief and in the Mount St. Healthy analysis, we believe that his conduct with his wife on this website was private conduct. Under Garrity, you only have to, you know, answer questions by the police department if it relates to your employment. This had no relation whatsoever to his employment. They asked him questions like, is that his penis? Is that his body in there? They asked him questions of what money are you making? And we believe as you look at those lies individually, they're not. The State of Arizona did not remove his license. So we believe that they're all pretexts. But we don't think you have to even deal with it, and Judge Tilburg didn't. I put it in the brief so you would know the arguments and what our counterarguments were. Under Mount St. Healthy, you have to take away the – if the conduct is protected, you can't terminate him because of the protected conduct. You have to have other reasons separate and aside from those. And we believe under our Goldbrook case that this was a retaliatory investigation, that their grounds and lies would never have occurred but for that website. Their investigation would never have occurred but for that website. So we believe under Mount St. Healthy that whatever occurs, the fruit of the poisonous tree, and you cannot use that against him under the Mount St. Healthy analysis. There was no firm policy against business on the side or something like that, was there? No, he wasn't terminated for that. There was no challenge against him. There was a policy about getting approval. But that was never an issue. He was terminated for his conduct. He was terminated for that website, for his involvement in it. And I think that is really clear when you look at what Judge Harris' testimony, you look at what he wrote in his termination letter. And so there's no question about that. And I want to reserve a few minutes, so I want to deal with this issue. And that is the so you've got this embarrassment. And we believe that violates the heckler's veto, clearly. It clearly violates Flanagan, clearly violates Berger or Taglia. Now you look at this issue about impacting the recruitment of females. There was none of that in his original termination letter, and that came out in the testimony of Officer Gaylord and Officer, I mean, Assistant Chief Gaylord and Hodges in 2002 in their testimony on appeal. That has been waived in this appeal. It's been abandoned. They haven't even fought on that issue. We were surprised on that because we believe it's quite speculative that the court would even, I think the court erred in saying that there was any evidence of that. Gaylord says, well, if I was a woman, I wouldn't work for the police department, clearly speculative. He has no idea. He can't be saying what a woman would or would not do. Officer Hodges said some females asked him when she was out on recruitment, some females asked him about it, asked her about it. So she concluded that, well, it may be an impact on recruitment. The evidence is that we present there's no impact on recruitment. They hire from two to four to six, six I think was the highest in one year, females. They have 80, 200 applicants. They have more applicants than they could ever, than they need. And so there's been no evidence. There is no impact on recruitment of women. And so that's been abandoned in this case. So if that's gone and you've got the embarrassment violating the heckler's veto, they have no justification that they have presented because Chief Harris was very clear, there were no internal impacts, none. So they are in trouble in that particular situation because it's protected conduct, they can't terminate him because of it, there's an adverse employment reaction, and they can't meet their Mount Healthy analysis, Your Honor. Finally, Your Honor, and I want to just talk a little bit about the second, unless there's a question, Your Honor, talk a little bit about the second appeal. That is the sanction appeal. I think, first of all, clearly that needs to be reversed because any sanctions would be against me. It was quite clear from the pellet reply brief that any of the court's order that the So I think that has to be reversed. But second, I think my ---- But what did the district court say when that was called to the district court's attention? The district court entered sanctions against me personally, Your Honor, in its order. It didn't enter any in its order on sanctions. It entered them against me. I thought the order was against your client. But the underlying order was the minute entry, the findings of fact were against  Then it did enter the order against my client. Well, was that called to his attention? That's my question. Your Honor, we were already up on appeal in the first brief, so we appealed it. No, it was not brought. I didn't file a motion to correct that. We were already up on appeal on this issue, so we went ahead and timely filed the notice of appeal on that and brought them together. But, Your Honor, we went ahead and appealed it because we don't feel there's any basis for sanction. If you look at the argument presented, it's an abandoned issue on appeal. We've been sanctioned because we presented to the court the evidence from their own public records, city of Chandler, saying, no, there's been no impact on recruitment and you know it. Why did you bring it before the district court judge and even make that argument in 2004? And that's what we got sanctioned for. Well, you got sanctioned for saying the wrong date of discharge. Your Honor, that, very humbled by that whole experience, and I have fallen on my sword as far as I could fall on that issue. Clearly, that was a mistake. It resulted from the heated, getting too far into the forest in this particular case. We've been litigating this, and I think we both, I know I came probably too involved in it and have backed out. Judge Counsel is a friend of mine, and I appreciate her. And that was a mistake I made. What was filed was not what I thought was filed, Your Honor. In my own mind, and I never went back and looked at it. I had a calendar to look at, and unfortunately, when she filed her Rule 11 motion, the court said for hearing within six days. I came back from vacation, and the next day I'm getting a phone call. Why am I not in court? So I never had a chance. It was set for September. I had a calendar to come up for my review, and so I argued it in my car on my cell phone. And if you look at my argument, that was the argument I thought I'd make. You can't catch somebody more on the cuff than that, I was honest. That was the argument I thought I was made, that they shouldn't have brought this argument in 2004, and that I believe that the Gaylord knew that was not a true argument back when he made it, because he would be aware of the employment history of the police department. But, Your Honor, I'd like to reserve the rest of my time. You may. Thank you. Good morning. I'm Catherine Baker, and I'm here for the city of Chandler defendants. I'm sure there may be many questions on the First Amendment issue, and then if possible, I would like to spend some time on the sanctions and fees. From our perspective, the Roe case governs all of the issues related to the First Amendment. In fact, I think our case is much stronger than the Roe case. Well, Roe – the problem with Roe is, of course, he's on his TV wearing a police-type uniform, at least, and one of his incidents occurs in the midst of a traffic arrest or something like that. I can see why, in Roe, the Supreme Court said, well, that's clearly job-related. That's employment-connected. A couple of things, Your Honor. Actually, the way I look at the Roe case is different. In Roe, the city of San Diego Police Department admitted the conduct was not job-related. And what the court did in the comment that I think Judge Fernandez referred to earlier said, well, the issue isn't really – the way I read it, it said, the issue isn't really whether it's job-related, it's whether it harmed the employer. And it referred to that admission by the police department where the police department admitted it wasn't job-related and said, really, we have to look at what they were saying. And what the court looked at was the harm to the employer. The reason the court looked at what the officer was doing, stripping off the uniform and I believe he was actually masturbating and then he was selling the tapes on eBay and he was selling police equipment and other things on eBay, the court looked at that because the court was projecting what the harm would be. Because in Roe, very interestingly, they didn't have manifest harm. In our case, we have – the record is replete with the manifest harm. In other words, we don't have to go look at the nature of Eibel's conduct with regard to applying the Roe case because we've got the manifest harm. We have got the comments to the officers. We've got – and it's Officer Hedges, not Hodges. She was the person who, when he sought sanctions, Mr. Knowlton didn't – he left it blank for her name, but it's Officer Amy Hedges. And what she testified to in the merit hearing was that she responded to a call where she was trying to quiet a fight in a bar. And what happened was one of the participants started gyrating and saying, hey, take it off, take it off, and flashing money at her. And the two bouncers from the bar had to run after the guy. And then all of a sudden, she becomes the focus. And instead of the law enforcement purpose that she is there for to stop the fight, she becomes an event that creates more disturbance. We have manifest harm here. And so the reason I say that this case is even stronger than the Roe case is because we don't have to look at what he did and project the harm. All we have to do is look at the harm and apply the Roe case. And the Roe case made it very clear that where there is harm were the officer's activities. And it says here – I'm just reading from the decision itself. Though outside the workplace and purportedly about subjects not related to his employment had injurious effect on mission of his employer and were not entitled to First Amendment protection under the NTEU line of cases. NTEU, the Supreme Court has told us, does not even apply in a situation like this. We have manifest harm. We have more than they had in Roe. I want to step back, however, and talk about one of the most fundamental things, and the district court found this, is we don't have any public concern speech. We've got no protected activity. And I know the court was asking some questions about whether that governs the issue and don't you have, for example, Judge Schroeder asked, aren't the photographs protected? And here I say there is no protected conduct. And that's what the district court found here. There wasn't any expressive conduct. There was nothing at all of that nature. And, in fact, the Supreme Court said it had no difficulty finding that there was no  The Supreme Court even said it had no difficulty. And I don't know whether it's a matter of public concern. It's a different question from whether it's expressive conduct. It's neither, Your Honor. Here's what's interesting. I don't know that I would agree on whether it's expressive conduct. It seems to me that you're putting something on a website and it's pornography and we've got all kinds of cases saying that pornography is a protected expression in the general public. But here's what's interesting about this case. And this is kind of where Divell is in in Catch-22. Divell has admitted that all he did was act as a prop for his wife. His wife testified she was not trying to express anything. She was not trying to convey any particularized message. She wasn't engaging. This is, at least according to her, in any expressive conduct. And what he did, he says, was merely act as a prop. In other words, according to him, it wasn't even his behavior. If it's not his behavior, he's not expressing anything. In fact he's not. Well, that's sort of like saying I'm just selling newspapers. I'm not trying to express anything. Well, if you're the author of the newspaper, it's one thing. But if you are the person in the picture, and this is according to Divell, who is merely shown in little body parts, and the picture is really of your wife and what she's doing, and these are his terms, that he's merely a prop, then you're not engaging in any expressive conduct. Well, that takes all kinds of actors right out of expression because they're just, you know, extras or minor characters or things like that. It seems to me that's a hard argument. And I understand your second argument, which is that it's not a matter of public concern, and probably that's a viable argument, but I'm not sure that it's a requirement. Your Honor, I believe that in there were two things in the Roe case. And it said, it talked about where there was harm. NTEU does not apply. And it said that when speech does not touch on a matter of public concern, we don't even get to the Pickering balance test. So in our case, you apply the same analysis. There is no difference between our case and the Roe case, which is governing, except to see that in this case the harm was manifest. And so why is it manifest? Because of the testimony we had about the impact on the officers, on the function of the department. Okay. Am I correct that he was terminated after it became publicly known that he was the one who was doing this? He was terminated after the department found out about it. And Mr. Knowlton is right that the way the department found out about it was that someone in dispatch had heard rumors and somehow the site was found and they got on the site and they sent an e-mail to Caitlin, who was actually Megan Dival, said, hi, Megan, and then called to get Megan and got Ron Dival. And Ron said, this is where one of his items of misconduct came in for which he would have been terminated anyway, he said, if anybody asks you, you tell them it's not me. He was urging the dispatch employee he spoke with to lie to anyone in the department who asked him about it. And it was from that sequence of events that the Web site became known. And it was after that that he was placed on leave and investigated and eventually terminated not just for the Web site, but for the lies that he told. Okay. When did the media show up? The media showed up. I don't have the exact chronology. I don't know if it was five days later. From the stuff you gave us, the media was on it by January, I think January 24th. And I think the suspension message went out just about that time, January 25th, I think. Not the termination, but the initial suspension. So it looks like it was just about simultaneous. It may have been, and a mystery to us would be how did the press ever find out about it. There's never been any proof of that. We have no idea. Oh, I'm not saying there's any connection. I'm just saying the question was when did the media find out. Yeah. And if one looks at the articles that were presented, we don't have any idea when the media found out. On the newspaper clippings presented, there's one as early as January 24th, at least. I guess what I'm saying is to the city of Chandler it would have been irrelevant as they were going on separate paths, except to the extent that when the media did become aware of it is when we had more derision on the department that caused more disruption and more officers who were ashamed to be seen in public in their uniform and who were accosted in public and additional negative events occurred. But it's not accurate to say, and I know that Mr. Knowlton has made this argument, it's not accurate to say that nothing would have happened had there been no publicity, because the events that were impacting the department, the morale on the department, came equally from the knowledge of the people who found the website and spread the existence of the website. And then there were incidents when a supervisor thought he had heard something about the website and asked Mr. Dybul about it, and Mr. Dybul lied about it. And so we got a sequence of lies about the website, some of which occurred in the internal affairs investigation. Some of those lies occurred outside the internal affairs investigation. The lying to the supervisor, the encouragement of the dispatcher to lie to anyone who asked her, which would have included supervisors, that was misconduct, for which Donna Dreska, the city manager, has made clear he would have been terminated anyway. So when we get to the Mount Healthy argument and talk about whether he would have been terminated anyway, it's not accurate to say that the misconduct that got him terminated arose only from the internal affairs investigation asking questions specifically about the website itself. He told lies separate and apart from the internal affairs investigation and told a series of lies. Of course, our position is that he could be terminated for lying in the internal affairs investigation anyway, because that is basically in a police department, you lie, you die. But that is not something that arises only from participation in the website. It arises from a legitimate internal affairs investigation. We have the testimony of Sergeant Austin who says, you know, when you have facts that tell you there may be police misconduct, you have to investigate. You have to ask questions whether there ultimately turns out to be misconduct or not. This is what happens in a police department. The argument, if I understand it, of your opponent is that it isn't police misconduct. It's protected activity, and that somehow taints the questions. Well, for example, we have the case where, and it's cited in the briefs, I'm sorry, I don't remember the name, where the officer was accused of having sex with another employee who happened to be a minor at the time. And that, of course, was not protected conduct, and the person was fired for that. But the question is, where is the police department when they are just starting to ask questions? Are we to say never ask a question because, oops, what if you run up to an issue that might be protected? No. We are entitled to ask our questions to find out what happened. And if Mr. Dybul is going to lie, he is going to suffer the consequences. And then, of course, not only did he lie in the investigation, he had lied to supervisors and to co-employees outside the investigation and could be terminated for that. And if your answer is, I did not have sexual relations with that woman, you can be punished for it, even though the question perhaps shouldn't have been asked. Well, I think we disagree fundamentally that the question should not be asked. There was the case where the police department went so far as to ask about abortions that couldn't even arguably have fallen within the conduct about which they could legitimately ask. And the Court said, okay, that went too far. But to ask about sexual conduct is something that a police department can ask about. And here, the police department asked reasonable questions arising out of the information that it received. What do you do with the Heckler's veto cases, the Flanagan and Berger? You're saying that the police aren't, you know, embarrassed to wear the uniform and things like that. But in Berger, for instance, the court was very sympathetic to the police department, said we know that this kind of this expressive conduct of appearing in blackface by one of your policemen harms the police department's relationship with the hard one relationship with the black community. And we know that creates problems and everything else. But we we don't let opposition to protected speech dictate the result in a case like this. What do you do with that? That was pretty serious. Well, the Berger case, and I understand your question, that's a Fourth Circuit case from 1985 and certainly would not be precedent in light of Roe. But the Berger case, there they also noted that there wasn't any evidence of internal disruption such as the loss of harmony within the department or the impairment of working relationships. There were some African-American officers who were not at the party who heard about it who raised the issue. But nobody came forward and said here's what happened. Here's how I've been accosted. Was there testimony here that we can't work with Dival? That, you know, the people he patrols with or whatever he does can't work with him now? No, there wasn't, Your Honor. There was testimony that there was an erosion of public trust and confidence, which even Dival testified makes an officer's job more dangerous. Okay. That's not an internal difficulty of the Pickering type. Let me tell you this, Your Honor. With regard to the Heckler's veto, by analogy, we've cited to you the Meltzer case, which was the case where you had the teacher who was a member of the Man-Boy Love Association or Society, whatever they called it. And the court said that it was appropriate to terminate that teacher because of the parent's outcry regarding the teacher's membership in that association because in that setting where you have a teacher that has to deal with parents and the public, that they actually become — it actually becomes an internal disruption because they work in partnership together. I would suggest to you that Roe has the right analysis and that Berger doesn't, and that the district court was right that the Roe analysis rejected the Berger and Flanagan analysis, and that this is not a Heckler's veto at all. What it is is we're saying that it is internal and external disruption because the police department cannot effectively police the public who feels that they have no respect for the police department. And things are going to happen like happened to Officer Amy Hedges when you go to keep the peace and you become yourself an object of derision and something that creates more disruption. It's exactly the kind of disruption that Roe said, hey, this is something that is not allowed. I don't know how much Roe — it's a little hard to tell sometimes where Roe is going. I mean, in winding up their opinion, they say Roe's expression was widely broadcast, linked to his official status as a police officer, and designed to exploit his employer's image. And that's different. Well, Your Honor, I don't think it's different. I think the reason they were discussing that, the reason you have that language in Roe is because you didn't have the manifest harm to the department. And so the court is having to say what is the character of this conduct which was going to create the harm. In our case, we don't have to do that, because we have the manifest harm, which, by the way, we didn't have to show. But we did show. And therefore, the court, the district court here wasn't in the position of saying, okay, let's look at, for example, when Divell told his friends about the website and they also joined, and they did put a police uniform on the website. And they did have a police officer with a Chandler uniform knocking on the door and seducing a woman. We had that evidence in our case. And not somebody else has to be fired and bring another case, I guess. Well, that was another person who put it on the website, but it was Divell's friend, it was Divell's conduct who put that in motion, which, to me, says this is a legitimate concern that the department has. All of this conduct, everything, creates a legitimate concern to the department, because if they can't do anything about it, then we're going to have more instances like that. And I think that's the difference here. I think the reason that the Roe court was using that language is because they had to project what the harm could be and what the risk of the conduct was. And here we don't have to do that, because we had officer after officer after officer who filled out the forms, who talked about the problems in policing. We had Gaylord and Hedges who said something, and we had Upshaw who said something about recruitment. And then we had people who talked about the problems that embarrassed them. They didn't want to wear the uniform and, you know, the son who wouldn't dress as an officer. If I can, Your Honor, may I talk briefly about the sanctions and the fees? The court did appropriately sanction Mr. Knowlton for the arguments that he made were inappropriate. He said several times today that we have waived the argument of harm to recruitment, and I don't know where he got that. That's never been waived. It was mentioned in the briefs. It's not appropriate to say it had been waived. But what was really harmful about what Mr. Knowlton did was, in addition to filing his motion, which was inappropriate, to accuse these two sworn officers of lying when, in fact, if you look at their testimony, it's not even capable of perjury. He never had any proof that Gaylord, for example, didn't feel what he actually didn't hold the opinion that he expressed. He didn't have any evidence that Amy Hedges didn't face questions at five different recruitment trips. He had no basis for making the arguments that he made. I heard Mr. Knowlton say here today, hey, I was caught on the cell phone, and, gee, those are the arguments I thought I made. The reason he was caught on the cell phone is because he didn't open the order or he did open the order the night before, but didn't show up for the hearing. He wasn't familiar with what was in his pleadings. He filed an incomplete draft. He made an argument that had no legal or factual basis at all. Is there a mistake in the party that was sanctioned in the minute order? That's not an issue that I recall being raised. The person who was sanctioned was Mr. Knowlton. I just looked at the order and the sanctions were against him personally. The judgment I saw is against the parties. Maybe there's inconsistent language. Well, the problem is the judgment appealed from is against the parties, I do believe. I'm looking at the order that includes the motion for new trial and the motion for Rule 11 sanctions. It says plaintiff's counsel must pay all attorney's fees and costs that defendants incurred as a result. I'm sorry. Listen. We're looking at the order dated February 9th, 2006? No, this was July 8th of 2005. Yeah. Well, when the order for sanctions is issued, the judge issues an order for sanctions on the parties, not on counsel. Now, I don't see how we can avoid reversing that. Well, he says for his Rule 11 sanctions in the ‑‑ in his July 8th, 2005 order that the Rule 11 sanctions and the fees and costs regarding the motions for new trial are against. That's an interim order. The final judgment, the final appealable order runs against the parties. And is that remanded then just to correct to whom it's ‑‑ Well, that would be tricky because then the person who they run against hasn't had a chance to appeal on his own behalf. Yeah, I don't see that issue. I didn't see that issue being raised. And that would be very unfortunate. We'll be back here again. And you know that the Federal Court referred Mr. Knowlton. Okay. I'm sorry. Yes. Thank you. Your Honor, I want to just deal with a couple things. And I thought I would deal with the Roe opinion. I'm still not sure what she means by Roe, Ejected, Flanagan, or Battaglia. I just don't see where the Court even addressed those issues or had anything to do with the case. When we're talking about whether there's public concern, the Court was very clear when it said, the present case falls out of the protection afforded in NTEU, national treasure. The authorities that instead control and which are considered below are the Pickering Connick test. And then it discusses public concerns. The Court didn't even address public concerns. I think the Court was pretty clear that in dealing with national treasure, we're not talking public concern. We're talking protected right, justification for action. And when you read the Court's conversation about adverse impact, that the speech at issue even arguably had an adverse impact. In Roe, the speech at issue, that tape of that officer stripping impacted the operations of the police department. Nothing about this website in any way, shape, or form impacts the operation. It was the press. And I think when you look at Flanagan and you look at Battaglia, they're very clear on this point. And it says, and I'm reading from the Berger case, Your Honor, it says, but we need not decide whether only internal disruption can ever suffice as a justification for public order, public employer disciplinary action directed at employee speech. Assuming that under some circumstances, disruption by employee speech of a public employer's external operations and important external relationships might justify disciplinary action, we hold that those circumstances cannot in faithfulness to the First Amendment principles be found here. Here not only was the perceived threat of disruption only to external operations and relationships, it was caused not by the speech itself, but by threat and reaction to it by offended segments of the public. Short of direct incitements to violence by the very content of public employee speech, in which case the speech presumably would not be within general First Amendment protection, we think this sort of threat and disruption by others, reaction to public employee speech simply may not be allowed to serve as justification for public employee disciplinary action. Was that Berger? That was Berger, Your Honor. Yeah. And this occurred in a short time frame. The 23rd to the 25th, the press was over. One incident, the Hedges incident, that was it. There was not a lot of things that went on here in an 800-man police force. A total of 80 responded. Ten percent said, well, we've got to ask questions about it. There were very few, a handful that actually, and they're all in the briefs, only a handful actually said, well, I was really embarrassed. This had bothered me. So, Your Honor, we don't feel that that is sufficient grounds in and of itself, either one of those grounds, in and of itself, justification. Thank you, Your Honor. Counsel, your time has expired. The case just argued is submitted for decision. That concludes the Court's calendar for this morning. The Court stands adjourned. Thank you.
judges: Schroeder, Canby, Fernandez